UNITED ORDER OF FORESTERS and others, Appellants, vs.
MILLER and others, Respondents, and PADDOCK and
another, Interpleaded; Respondents.

*February 10—October 10, 1922.*

*Fraternal insurance: Repeal of by-law relating to old-age dis-
ability: Reserved power: Estoppel: Classification of members:
Mutuality and uniformity: Transfer of member to new class:
Accounting: Special assessments: Apportionment of funds
and valuation of insurance policies by commissioner of in-
surance.*

1. A fraternal benefit society could, when realizing that the pay-
ments required from its members were inadequate to provide
for the old-age benefits it had by by-law agreed to pay to
members who had attained the age of seventy years, rescind
and cancel the provisions relating to old-age disability as to
those members who had not become seventy years of age, by
a by-law duly passed, and such a change was necessary and
a proper exercise of the reserved power to amend its by-laws:

(*a*) The provision as to old-age disability being part of a
plan certain to wreck the society if long continued, the mem-
bers holding such policies had nothing approaching a vested
right, and the society is not estopped from asserting that the
action repealing the provision did not apply to then existing
contracts.

(*b*) Notwithstanding sec. 1978, Stats., a fraternal benefit
society may make provision, upon adequate rates, for an
old-age disability benefit for members.

2. A classification of members into two classes, one class to con-
sist of the mortuary benefit members who were such at the
time the rates were increased and such similar members ad-
mitted after the increase in rates on higher rates than such
members who had been admitted theretofore, whose certifi-
cates were to be valued on an "accumulation basis," and the
other class to consist of all mortuary members admitted after
such increase, either as new or transferred members, on aver-
age higher rates than those paid by members of the first class,
whose certificates were to be valued on the tabular basis, and
who were required to pay adequate rates with adequate
reserves, is improper under sub. 2 (f), sec. 1958, Stats. 1921,
authorizing such a society to classify membership, there
being no mutuality between members of the first class:

(*a*) There can only be real mutuality where contributions
are made *pro rata* for benefits conferred.

(b) A member's equity in the funds of a mutual benefit society cannot exceed that sum which measures his equitable *pro rata* share of the contributions from which such funds grow.

3. Under sub. 2 (d) (3), sec. 1958, and sub. *22m* (2), sec. 1959, Stats. 1921, a member of a fraternal benefit society, on being transferred from one class of members to another, was entitled to the transfer of a proper accounting value of his interest in the fund of the class from which he is being transferred, notwithstanding sub. 2 (f), sec. 1958.

4. A member of a fraternal benefit society, on transfer from one class to another, should be re-rated as of his age at the time of the change rather than at the age of entry into the association.

5. The society may levy special assessments to meet deficits arising from insufficient accumulation of funds, but as to deficiencies arising from inadequate rates paid by some members no precise rule can be laid down except that the requirements as to mutuality and uniformity must control.

6. The valuation of the policies and the apportionment of the funds heretofore made by the insurance commissioner is in substance ratified and approved, subject to future readjustments.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Reversed, with directions.*

The plaintiff, a fraternal benefit society doing business in this and a number of other states, brings this equitable action to obtain declaratory relief under sec. 2687*m*, Stats. (ch. 242, Laws 1919). A number of persons holding certificates issued by plaintiff with different conditions and benefits therein specified were made parties defendant as representing all holding such forms of certificates, under sec. 2604, Stats., permitting one or more persons to sue or defend for the benefit of the whole where it is impracticable to bring them all before the court.

The plaintiff was incorporated in this state in 1893 under the then name of Columbian League, and by amendment in 1894 became a fraternal benefit society with present title. Its early history is given in the case of *Independent Order*

*of Foresters v. United Order of Foresters,* 94 Wis. 234, 68 N. W. 1011. It was duly re-incorporated in July, 1901.

It grew in membership until in December, 1919, just before the commencement of this action in February, 1920, it had outstanding about 11,000 certificates representing over $10,000,000 of insurance and is doing business in the states of Illinois, Missouri, Indiana, North Dakota, Michigan, and Minnesota, besides Wisconsin. Its articles of incorporation contain the following:

"Article II. Section 1. The business and purpose of this corporation is and shall be to found and conduct a fraternal benefit order, on the lodge system, with ritualistic form of work, for the sole benefit of its members and their beneficiaries and not for profit, on the assessment plan, and thereby to insure the lives of its members and furnish relief and insurance protection to its indigent and disabled members and their beneficiaries, and to promote morality, patriotism, and good citizenship."

Article III provided for a representative form of government by regular corporate meetings through representatives elected in the subordinate bodies. Such corporate meetings are to be known as the supreme court, in which representatives only shall be entitled to vote. Such supreme court shall exercise the powers usually vested by law in the stockholders of a private corporation, shall be the legislative and governing body, and have full control and supervision of the order and its affairs, organize and charter the subordinate bodies, and enact laws and rules for the governing of the order and the control of its affairs.

By a by-law enacted in 1897 and continued in substantially the same form thereafter, it was provided that such supreme court shall at all times have power to enact such laws as it may deem proper for the government of the order and reserved the right and power to make such changes in existing laws and to enact such laws as it may deem for the best interest of the order, and all certificates providing for

the payment of any benefits to any member or to, any person as beneficiary shall be forever issued subject to such reserved right and power.

The form of its certificates or contracts of insurance and the nature, conditions, and promises therein contained constantly changed and were .substantially in accord with the provisions and changes of the laws enacted by its supreme court. The applications for and certificates of insurance contained provisions as to the consent by such insured to such laws and changes. The material provisions of such laws claimed to be the basis of the rights of the several classes of insured members who are represented by the defendants herein are as follows:

In 1897 it was provided that any member who passed his seventieth birthday and on each subsequent birthday thereafter should be paid "old-age disability benefit" of ten per cent. of the amount of his insurance for each such payment until the full amount of his insurance was paid, less any sum previously paid on account of disability benefits. Provision was also made for benefits to be paid to members for partial or permanent mental or physical disability, and with a release of the payment of all further dues in case of total and permanent disability and on reaching seventy years. On the death of such member the designated beneficiary would receive the full amount of the insurance less any and all sums previously paid for disability benefits or old age.

At the meeting of the representative body in 1900 the above stated provision as to old-age benefits and waiver of payments after a member reached his seventieth birthday was repealed and did not thereafter appear in any of the printed laws, objections to such having been made by the insurance departments of several of the states. There was continued, however, in substance, the provisions as to partial disability and as to death benefits. Such provisions, however, continued, as theretofore, to recite, as a

deduction to be made from any payments to the beneficiary, whatever may have been previously paid on account of old-age benefits, this latter clause being omitted in 1918. Other changes were made, but other than as hereinafter specified are not deemed material.

### Payments.

Provisions were made from time to time for monthly payments by the insured according to age and occupation and the amount of insurance, and tables made showing such required payments were adopted by the representative body from time to time. It was also provided that "the rate that a member pays at joining shall not be changed so long as the member remains continuously in good standing, and in an occupation of the same rate of monthly payment."

### Insurance fund.

The insurance fund was originally provided for by setting aside what was substantially eighty-five per cent. of the insurance premiums, and in 1899 it was provided that such insurance fund should be used exclusively for the payment of mortuary and disability claims against the order and the necessary expense incurred in settling or defending such claims and in the care and management of said fund. Such provision was amended in 1910 so as to read then and until 1918 as follows: "The whole life insurance fund of the order shall be used exclusively for the payment of mortuary and disability claims against the order under whole-life benefit certificates."

### General fund.

In 1897 this consisted of ten per cent. of the monthly payments and of other receipts not otherwise disposed of, all funds and property of whatever kind being made liable to pay death and disability benefits. This was changed in 1899 to read fifteen per cent. Changes were made in 1900, 1906, and 1918, not material to be recited.

### Special assessments.

In 1897 it was provided that should there be, from any cause, insufficient funds available to pay any benefits, a special assessment on all members should be ordered, and failure to pay such special assessment within thirty days after such call would cause suspension of any delinquent member. In 1899 such special assessment was fixed to be equal to one monthly insurance premium according to the established rates. In 1906 the special assessment of one month's insurance premium was to be levied on each insured member holding a whole-life certificate, and such provision continued in substantially that form until 1918.

### Insurance certificates.

The certificates issued varied in form from time to time. The earlier ones provided that on a member reaching his seventieth birthday and each subsequent birthday he is to be paid "the benefit for aged Foresters," etc., and a mortuary benefit less any and all sums previously paid on account of disability, total and permanent, or on account of "the benefit for aged Foresters." From 1900 on the provisions as to the payments on reaching the age of seventy were stricken out, as above recited, and there was then added in the form thereafter used a provision that in no case should there be paid under such certificate a sum in excess of the amount realized in the mortuary fund from one full assessment upon all the members of said order, except that from November, 1906, to September, 1918, such latter clause was further limited to the amount realized "in its whole-life insurance fund from one assessment upon all its members holding whole-life benefit certificates on its level-premium plan."

In 1918 a substantial change was made, providing that such designated beneficiary should receive such mortuary benefits as the contributions of said members shall provide when valued upon the basis of the disability and mortality

tables, with interest assumptions, established by the order and in force when the benefits accrue, not to be in excess of a specified sum, and shall be paid out of contributions made by the members of the class to which said member belongs. It provided also that the charter and laws of the order and all changes in each thereof thereafter made shall constitute an agreement between the parties.

Notwithstanding the change in rates that had been made at various times, it clearly appeared at the time of the meeting of the supreme court of the plaintiff in July, 1918, that the rates that had been paid by the members entering prior to 1900 at least were inadequate and insufficient under any proper insurance accounting to meet the obligations apparently assumed by the society even as to the mortuary benefits, and of course far more inadequate to meet the additional obligations as to members attaining the age of seventy years.

The surplus in the hands of the society accruing from previous contributions of its members, so far as it could be treated applicable to the so-called old-rate members, was apparently about as follows:

January 1, 1917..................$106,110 94
January 1, 1918..................  51,010 01
July 31, 1918....................  14,230 86

and claims then presented or allowed would practically wipe out such last sum. At the same time the surplus made by the contributions by the new members coming in under the higher rates from October, 1906, on, made a credit surplus considered as allowable to such new members on July 31, 1918, of $242,058.29.

It was then determined that a substantial change must be made in the method of plaintiff's doing business, and at such meeting provision was made to establish and maintain two separate classes of members pursuant to the provisions of sub. (2) (f), sec. 1958, Stats., hereinafter discussed.

At the same time and pursuant to the option given it by ch. 251 of the Laws of 1913, creating sub. *22m*, sec. 1959, Stats., relating to the valuation of fraternal benefit societies, the society substantially incorporated the provisions of said subsection as one of its by-laws.

The detailed action was substantially as follows: All the policies then outstanding were valued by the insurance commissioner of the state of Wisconsin pursuant to sub. *22m*, sec. 1959, and as of December, 1918, and an apportionment made of the funds then on hand by first taking from the then assets the expense funds and any present matured liabilities and then the reserves under the tabular basis for what had just then been started as Class Two of $191.28 with forty members, the balance then to so-called Class One and substantially as follows:

| Class of Members. | Members. | Amt. of Ins. | Amt. apportioned. |
|---|---|---|---|
| Old Rates ......... | 7,094 | $7,611,700 | $45,443 58 |
| N. F. C. 1906...... | 2,441 | 1,924,375 | 187,460 03 |
| N. F. C. 1914...... | 1,167 | 837,500 | 20,297 06 |
| N. F. C. 1918 ..... | 8 | 8,500 | 72 85 |
| Nat. Prem. 1906-8.. | 130 | 108,750 | None |
| Term 60, 1910...... | 802 | 574,875 | 7,496 78 |
| Totals | 11,642 | $11,605,700 | $260,770 30 |

It was considered that these members coming in from 1906 on and under N. F. C. rates were paying substantially adequate rates for the obligations to them by the society. There was then apportioned to the old or inadequate rate members the sum of $45,443.58, as above given, but some joining at ages from forty-seven to fifty-five had paid such rates that there was properly accountable to them about $30,000 of such sum, leaving a balance of $15,000 to about 7,000 old-rate members and apportioned to them at a flat rate of $2 per member. A year later, with the basis of the valuation and apportionment of December, 1918, a similar appraisal and accounting as of December, 1919, was made by the insurance department resulting as follows:

United Order of Foresters v. Miller, 178 Wis. 299.

| Class One—Accumulation basis. | No. of Certfs. | Amt. of Ins. | Credits. |
|---|---|---|---|
| Old-rate members............. | 6,543 | $7,010,425 | $69,095 74 |
| New-rate members, 1906 rates | 2,268 | 1,804,125 | 196,627 89 |
| New-rate members, 1914 rates | 971 | 693,500 | 22,685 77 |
| New-rate members, 1918 rates | 305 | 217,500 | 1,474 44 |
| Term to age 60, 1910 to 1918 | 706 | 507,500 | 7,240 62 |
| Term to age 60, 1910 N. F. C. 4 % | 92 | 61,500 | 34 86 |
| Term to age 50, Natural premium ............... | 92 | 88,750 | 13 75 |
| Total    • | 10,991 | $10,383,300 | $297,173 07 |
| *Class Two.* | | | |
| Ordinary life .............. | 23 | $19,000 | $442 82 |
| 20-payment life............. | 46 | 36,250 | 325 97 |
| Term to age 50............. | 2 | 2,000 | 2 18 |
| Term to age 60............. | 6 | 5,500 | 11 23 |
| Term to age 70............. | 1 | 500 | 2 38 |
| 20-year term................ | 5 | 4,500 | 41 86 |
| Paid-up at age 60........... | 6 | 5,250 | 66 80 |
| Paid-up at age............. | 7 | 5,500 | 43 79 |
| | 96 | $78,500 | $937 03 |
| Grand total | 11,087 | $10,461,800 | $298,110 10 |

The rates which had been paid and established at the various times are here tabulated for convenience and substantially at five-year periods rather than yearly as presented in the record, and are as follows:

*Table of monthly rates for $1,000 benefit.*

| (1) Age. | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|
| 18 | .60 | .81 | .87 | .88 | | .98 | 1.06 | 1.08 |
| 19 | .61 | .84 | .89 | .91 | | 1.01 | 1.08 | 1.11 |
| 20 | .62 | .86 | .91 | .94 | .97 | 1.04 | 1.11 | 1.13 |
| 25 | .67 | 1.00 | 1.04 | 1.09 | 1.14 | 1.22 | 1.24 | 1.27 |
| 30 | .72 | 1.16 | 1.22 | 1.28 | 1.35 | 1.45 | 1.42 | 1.46 |
| 35 | .78 | 1.39 | 1.45 | 1.53 | 1.64 | 1.77 | 1.65 | 1.70 |
| 40 | .88 | 1.68 | 1.76 | 1.86 | 2.04 | 2.21 | 1.96 | 2.03 |
| 45 | 1.08 | 2.06 | 2.16 | 2.31 | 2.61 | 2.82 | 2.38 | 2.49 |
| 50 | 2.50 | 2.58 | 2.71 | 2.91 | 3.47 | 3.74 | 2.97 | 3.11 |
| 51 | 2.60 | 2.70 | 2.83 | 3.06 | 3.68 | 3.97 | 3.11 | 3.27 |
| 52 | 2.70 | 2.84 | 2.97 | 3.22 | 3.94 | 4.23 | 3.27 | 3.43 |
| 53 | 2.85 | 2.98 | 3.12 | 3.39 | 4.21 | 4.53 | 3.43 | 3.60 |
| 54 | 3.00 | 3.13 | 3.28 | 3.57 | 4.52 | 4.85 | 3.60 | 3.79 |
| 55 | | | | 3.76 | | 5.21 | 3.79 | 3.99 |

The above columns of rates are as follows:

(2) Old-rate members prior to October 1, 1918.

(3) N. F. C. (National Fraternal Congress) on and after October 1, 1906.

(4) N. F. C. members on and after October 1, 1914.

(5) N. F. C. members on October 1, 1918, with preliminary term. One cent added for certain disabilities.

(6) N. F. C. rates necessary to pay $100 per annum from age 70, and in case of death before $1,000 is paid, the balance payable as a death benefit (the feature in question here).

(7) N. F. C. rates necessary for combined death and total disability benefits.

(8) Am. Exp. 4 % rates applied October 1, 1918, to the old-rate members at entry ages.

(9) Am. Exp. 4 % rates, with preliminary term, applied on and after October 1, 1918, to new and transferred members in Class Two at transfer ages.

In attempting to carry out these very substantial changes in the relationship between the order and its various members and between the several classes of members with each other and so affecting the whole body of the membership, it seemed proper to submit the various questions involved to the court for determination.

Trial of this action was commenced in September, 1920, findings made in March, 1921, and judgment entered on April 28, 1921.

The court found in substance that the plaintiff had power to issue certificates providing for old-age benefits for its members upon their arrival at the age of seventy, payable in instalments thereafter; that such certificates were contracts which could not be changed or abrogated by subsequently enacted by-laws; that pursuant to the power given by statute the plaintiff has established two classes of members; that no funds secured from payments made by members of one class can be applied to the payment of claims made upon certificates issued to the members of the other

class; that all funds secured by payments from members of Class One must be devoted to the payment of claims upon certificates issued to members of that class; that the funds available to pay claims on such certificates are now insufficient to meet such claims as they mature without levying special assessments upon members in such class, and that the plaintiff has full power to make such special assessments; that there is no situation here presented by which defendants can be estopped from asserting a claim to all the benefits provided for in their respective certificates.

Further findings were made as to particular defendants having such old-age and disability provisions and determining the respective amounts due them.

As conclusions of law he directed the entry of a judgment determining that all laws of the plaintiff attempting to abolish the rights of members holding certificates providing for old-age benefits and release of further assessments violate the obligation of such contracts and are null and void. That by-laws authorizing members who transfer from Class One to Class Two to have transferred with them any previous accumulated payments made by them are null and void. That several of the individual defendants recover a judgment against the plaintiff for the various sums found due them, and if sufficient funds are not on hand to pay such amounts that it levy a special assessment.

From such judgment the plaintiff and several of the defendants have appealed.

For the plaintiffs-appellants *United Order of Foresters* and others, there were briefs by *Charles N. Brown* of Madison and *James Schoonmaker* of St. Paul, and oral argument by *Mr. Schoonmaker*.

A brief was also filed by *James D. Swan* of St. Paul, attorney *pro se* (interpleaded defendant and appellant), and a separate brief by *Mr. Swan* as attorney for the defendants-appellants *Brodie* and others.

*W. M. Steele* of Superior for the defendants-respondents *Miller* and others.

For the defendant-respondent *Stevenson* there was a brief by *F. K. Shuttleworth* and *F. D. Shuttleworth,* both of Madison, and oral argument by *F. K. Shuttleworth.*

*Abb Landis* of Washington, D. C., on behalf of the National Fraternal Congress, as *amicus curiæ.*

ESCHWEILER, J.  The plaintiff, a fraternal benefit society organized under the laws of this state in 1894, now, after having by proceedings of its governing representative body, attempted to readjust its methods of doing business, brings this action for declaratory relief, praying judicial approval of such readjustment and for a judicial determination as to the respective rights and liabilities between it and its several kinds of members, and they among themselves.   Individual members holding different forms of certificates issued by the plaintiff order at different periods are made representative parties.   Substantially the entire history of the plaintiff order was presented, and it and the results reached by the insurance department from an examination of the plaintiff organization are before us.

We shall not here consider so much the specific findings and exceptions thereto, or whether the judgment is in exact accord with such findings, but rather, it being an application for declaratory relief, dispose of those which seem to be the essential and vital questions presented and upon the entire record.   The matters that we shall so consider may be summarized as follows:

*First.* May the plaintiff abrogate or repudiate its written promise to the older members to pay them an old-age disability benefit by annual instalments of the sum insured commencing at the age of seventy, and relieving members attaining such age from further dues or assessments?  The trial court answered in the negative.

*Second.* Is the separation of the members into two classes legal and proper?  This was upheld on the trial.

*Third.* On a member changing from one kind to another in the plaintiff's scheme of insurance, may he then transfer into such new class or kind of insurance any present interest he may then have in any accrued reserve or surplus in plaintiff's hands? The trial court held this could not be done.

*Fourth.* On such change from one to another class, form, or kind of insurance, may such member be re-rated as of the age of entry into the association or must it be as of the age at time of change? This was not disposed of below.

*Fifth.* If classification is proper, to what extent if at all may members in one class be assessed to meet the obligations due members in another class? The trial court apparently held that they could not be.

*Sixth.* Was the valuation of the policies and the apportionment of the funds as made by the insurance commissioner as of December, 1918, and December, 1919, legal, fair, and equitable? This was not decided by the trial court.

On the first matter presented we are confronted with the following situation, many of the facts now cited being also applicable on the other questions:

As part of the entire reorganization plan of a mutual benefit society with an insurance feature, it seeks to overthrow or repudiate its written obligations not merely with some particular insured member or his beneficiary on some particular certificate, but 1,900 and over, of such certificates.

It is organized under a law directing, and with a charter prescribing, that it is for the mutual benefit of its members.

It is a body whose policy and administration is governed by representatives selected by the vote of the members of the subordinate bodies.

It has reserved to itself the right to make subsequent changes in its by-laws, and the members have given, in their applications or by their acceptance of certificates, some form of consent to subsequent changes.

Of prime importance is the undisputed fact that at no time were the payments required from the members receiving such certificates adequate or high enough to secure the future payment, under any recognized method of insurance accounting, of the obligation on the part of the company to pay even for life insurance in its simplest and cheapest form, viz: the death-benefit provision, and therefore still more inadequate to meet the obligations here in question.

The trial court in disposing of this case held that, irrespective of any reserve right in the association to pass subsequent amending or repealing by-laws or of any written consent of the members to such changes, the changes here asserted by the plaintiff were of such substantial nature as to make them unlawful impairments of the contracts. This conclusion was evidently reached from a careful and very reasonable interpretation of former decisions of this court in disputes between a member or his beneficiary and such a society, which held that, without or even with such reserve power to change and consent thereto by the member, any attempted change which affected the material and substantial part of the contract without the express consent of the member to such change was invalid.    We briefly quote the following:

In *Morrison v. Wis. O. F. M. L. Ins. Co.* 59 Wis. 162, 166, 18 N. W. 13, a subsequent change as to the requirement of notice of death was held invalid.

In *Wuerfler v. Trustees W. O. D.* 116 Wis. 19, 92 N. W. 433, the nearest in similarity of facts with the situation here presented, it was held that an attempt to change from a definitely fixed death benefit to one of an indefinite sum, against the express refusal of the member to be bound by such change, was invalid.    Page 28.

In *Jaeger v. Grand Lodge Hermann's Sons,* 149 Wis. 354, 135 N. W. 869, in which there is a reference to and discussion of many other cases of this court and of other jurisdictions and which expressly followed the *Wuerfler Case,*

*supra,* it was held that a subsequent change requiring the payment of a deficiency in assessments or a deduction from the face of the policy was invalid.

*Stirn v. Supreme Lodge Bohemian S. B. Soc.* 150 Wis. 13, 136 N. W. 164, held that a change attempting to cut off a right originally given a member to a payment upon the death of his wife could not lawfully affect such benefit, even though the member, while refusing to surrender the old and take a new certificate, continued to pay assessments.

In *Sweet v. Modern Woodmen of America,* 169 Wis. 462, 172 N. W. 143, a subsequent attempt to require positive proof of death as a condition precedent to the right of recovery and thereby denying the right, theretofore recognized, to rely upon the presumption of death arising from unexplained absence of seven years, was deemed ineffectual. (The same by-law, though in existence at the time of the issuance of the policy, was held invalid as unreasonable and against public policy in *Fleming v. Merchants' L. Ins. Co.* 193 Iowa, 1164, 180 N. W. 202, 188 N. W. 703, and in *Boynton v. Modern Woodmen of America,* 148 Minn. 150, 181 N. W. 327.)

The following decisions upheld a subsequent by-law because not effecting a material change: *Hughes v. Wis. O. F. M. L. Ins. Co.* 98 Wis. 292, 73 N. W. 1015, avoiding the policy in case of suicide (but this might well be upheld on the well recognized rule of public policy) ; *Curtis v. Modern Woodmen of America,* 159 Wis. 303, 150 N. W. 417, a subsequent provision defeating the right to recover for death resulting directly or indirectly from the use of intoxicating liquors; *Dean v. Dean,* 162 Wis. 303, 308, 156 N. W. 135, making a change as to the persons to take as beneficiaries in case of predecease of designated beneficiaries.

All such prior decisions were in the narrow field of the rights of some one particular insured or his beneficiary and the society, and where the rights asserted were accrued so far as they ever could be, and the contracts there considered

were treated as though they were made at arm's length between the individual member on the one hand and the society as a distinct entity on the other. The relationship of such members to each other as fellow-members and the basis upon which their contributions to the society must be predicated were not there considered. So considered, we do not deem the result we are here reaching as overruling the first line of cases just above cited, but as merely now holding that the conclusions reached in such cases are not applicable to or controlling on the much broader field here presented.

Furthermore, in those cases the establishing of the claims of the respective plaintiffs resulted in conferring upon them substantial financial benefits in accordance with their contract and with no substantial loss or serious injury to the fraternal orders concerned. In all such cases force and effect was given to purely legal rights without having presented for consideration in any of them the very substantial impairment, if not total destruction, of the organization as such there concerned, which consideration and situation here and now stare us in the face in this equitable and readjusting action. To recognize such legal rights as were there acknowledged to the individuals concerned in the wholesale situation now presented would be practically barren of result to the individual members asking for or who might claim such right, because to enforce them on the large scale required would lead to certain and inevitable disaster to the society as a whole. In such situation and in this proceeding the equities of the great majority of the members must be deemed superior to and controlling over the mere legal, and to all practical purposes insubstantial, rights of the minority, all being innocent parties to a mistaken policy.

The experience of societies similar in their purposes to those of the plaintiff, and the wrecks of many of which have added to the weight of the lesson, has now demonstrated

that when engaging in the business of paying benefits to the members or their beneficiaries it can only be successfully carried on when pursued along lines marked out by the actuary rather than by the altruist.

What are the real lines of safety in such an enterprise has long been recognized of such an abstruse or complicated nature and beyond the ken of the great mass of mankind as to invite and require state regulation. *German Alliance Ins. Co. v. Lewis,* 233 U. S. 389, 412, 34 Sup. Ct. 612; *People v. Hartford Life Ins. Co.* 252 Ill. 398, 96 N. E. 1049, 37 L. R. A. N. S. 778.

It is now well and long established as a matter of insurance statistics just what annual contributions are required from individual members of large groups of such members to provide for payments of designated benefits. A mistake in collecting less than the laws of averages and actuarial insurance require foredooms to failure, and no present-day performances of the spirit of fraternalism can, or at least does not, bridge the gap.

The contracts or certificates made and issued prior to 1900 and here in question were made by the representatives of the members with the individual members. They who were to be paid by the society, in effect at least fixed the amounts they, as individuals, were to pay to the society. The society was and can be no more than the fiscal agent of the members—their collector and their disburser. It can no more pay out more than the members furnish for that purpose than can the fountain throw its spray higher than its source.

By statute and by charter the society is expressly declared to be conducted for the mutual benefit of the members and their chosen beneficiaries and not for profit. The society and its members but embody that which was the epigram and epitaph of Dumas' Three Guardsmen, "Each for all and all for each."

Being such a mutual society for mutual benefits, it can-

not promise with any hope of long success to pay to its members amounts to meet which such members do not sufficiently contribute.

This view when applied to the present situation compels a holding that the society could, when realizing that its required rates were inadequate to provide for the promised old-age disability, rescind and cancel such provision, as it did in 1900 by the repeal of the by-law to that effect and before any member had reached such age of seventy, and that it was a change *ex necessitate* and a proper exercise of the reserved power to amend.

We deem this to be in accord with such cases as *Supreme Lodge K. of P. v. Mims,* 241 U. S. 574, 36 Sup. Ct. 702, followed by *Supreme Lodge K. of P. v. Smyth,* 245 U. S. 594, 38 Sup. Ct. 210; *Holt v. Supreme Lodge K. of P.* 235 Fed. 885; *Reynolds v. Supreme Council Royal Arcanum,* 192 Mass. 150, 157, 78 N. E. 129, 7 L. R. A. N. S. 1154, and note; *Thomas v. Knights of Maccabees,* 85 Wash. 665, 672, 149 Pac. 7; *Case v. Supreme Tribe of Ben Hur,* 106 Neb. 220, 184 N. W. 75; *Williams v. American Ins. Union,* 107 Kan. 214, 191 Pac. 291; *Funk v. Stevens,* 102 Neb. 681, 169 N. W. 6, 11 A. L. R. 639, note p. 644; *Fowler v. Sovereign Camp W. O. W.* 106 Neb. 192, 183 N. W. 550; *Hollingsworth v. Supreme Council Royal Arcanum,* 175 N. C. 615, 96 S. E. 81.

We are not unmindful of holdings of other courts to the contrary such as *Wilson v. Supreme Conclave I. O. H.* 174 N. C. 628, 94 S. E. 443, note in 11 A. L. R. 656, but qualified in the later case of *Hollingsworth v. Supreme Council Royal Arcanum,* 175 N. C. 615, 96 S. E. 81, *supra; Green v. Supreme Council Royal Arcanum,* 206 N. Y. 591 (reversed because of the duty to recognize the law of Massachusetts in the same case in 237 U. S. 531, 35 Sup. Ct. 724), and recognized as not applicable to a change by legislative power in *McClement v. Supreme Court I. O. F.* 222 N. Y. 470, 119 N. E. 99; also, *Tusant v. Grand*

*Lodge A. O. U. W.* 183 Iowa, 489, 163 N. W. 690, L. R. A. 1918 F, 452, and cited in note in 11 A. L. R. 656, and the same case again in 192 Iowa, 1232, 186 N. W. 195; but we cannot follow them.

It is urged on behalf of the holders of such old-age disability certificates that the society is now estopped from asserting any right to consider the action taken in 1900 as anything but prospective in effect, by reason of its having failed to expressly declare that its action was affecting then existing contracts or from failing to directly notify such members of such a claim as is now asserted. The nature of the society, however, its representative form of government, and the fact that such change did not affect any right for which such members had then paid any adequate consideration, prevent the application of any principle of estoppel. Such promise of plaintiff was part of a policy certain, if long continued, to wreck it, and the members of such a society have nothing approaching a vested right in a disastrous insurance system. *Case v. Supreme Tribe of Ben Hur,* 106 Neb. 220, 184 N. W. 75; *Thomas v. Knights of Maccabees,* 85 Wash. 665, 678, 149 Pac. 7, *supra; Polk v. Mutual Reserve Fund Life Asso.* 207 U. S. 310, 28 Sup. Ct. 65.

The society argues that the old-age disability provision in their earlier certificates was in fact and in effect an endowment, the right to issue which is apparently, by sec. 1978, Stats., given to other kinds of insurance companies than fraternal benefit societies and therefore impliedly withheld from the latter, and that, plaintiff having no statutory authority to so issue them, they were *ultra vires* and therefore void. We see nothing, however, in the statutes regulating fraternal societies or in plaintiff's charter that prohibits it making provisions, upon adequate rates, for just what it has itself designated as old-age disability as well as for disabilities arising from other causes than old age. That three-score-years-and-ten of themselves

bring burdens and sorrows and therefore disabilities is too sad to dwell upon and too true to be questioned.

So much, therefore, of the judgment below as held such old-age provisions still valid and as granted relief in that respect to certain individual defendants must necessarily be reversed and set aside.

### Second—Classification.

In alleged compliance with sub. 2 (f), sec. 1958, Stats., the plaintiff, in accordance with a by-law of 1918, undertook to classify or group its entire membership into two classes, and they were treated to some extent as such in the valuation of the policies and apportionment of the funds by the insurance department as of December, 1918 and 1919, a subject hereinafter discussed.

Such section so giving authority to such a society to establish and maintain two or more separate classes of members also provides that when such classes have been established, that, except so much as is used for expenses, all proceeds of assessments, "and the apportioned funds of reserves maintained for each such class of members, shall be kept irrevocably separate and apart from other assets or funds of any other class of members or of the society, and that all claims on certificates in any class shall be paid only from funds belonging to such class, and that no such classification shall be rescinded or discontinued."

Such classification was by plaintiff's by-law declared to be as follows:

Class One, the then present mortuary benefit members of the order, and such similar members thereafter admitted on the N. F. C. rates, the certificates to be valued on an "accumulation basis;" Class Two, all mortuary benefit members admitted after August 31, 1918, either as new or transferred members, on average higher rates than the N. F. C. table whose certificates are to be valued on the

tabular basis and paying adequate rates with adequate reserves.

The court found that such classification was made pursuant to the statute, and held that when so made no part of the funds set aside or apportioned to the one class could be transferred to another. The plaintiff is evidently satisfied with such classification, taking no exceptions to the court's finding in this regard. Such classification is attacked, however, by the appeals of several of the defendants so far as it involves the levying of assessments and transfer of funds from one to the other class.

As so divided and as of December, 1918, there were but forty members in Class Two and 11,642 in Class One. The following year Class Two had 96 members with $78,500 of insurance and an apportionment credit of $937.03; Class One, 10,991 members with $10,383,300 of insurance and with an apportioned credit on the accumulation basis of assets of $297,173.07.

How far such a classification resulting in having less than 100 members in Class Two, if the separation of the funds of each class is absolute and irrevocable as is apparently indicated by the language of sub. 2 (f), sec. 1958, *supra,* and as directly held by the trial court, both statute and ruling in effect making each such class an independent unit though nominally but a fraction of the plaintiff society, would conflict with the letter and spirit of other statutory regulations of such societies, and particularly sub. 1 (b), sec. 1958, requiring a preliminary membership of 500, it is not now necessary to determine.

This statute as to classification is permissive merely, and the society acting under it is not required to have its action approved by the insurance department. Neither does the statute prescribe the method of, conditions or limitations upon such action; those are left to the management of the society subject only to the veto power by the court to some

particular form of such action and when challenged as here in legal proceedings. That veto power we shall exercise in the present situation and shall and hereby do set aside plaintiff's attempt to separate its membership into two classes.

A classification with the important results following it of the membership of such an organization, whether so specifically required by statute or not, must be based upon the controlling and required element of mutuality between the members of such proposed class and upon some idea or system of uniformity. We think each of these is conspicuously absent in the classification made by plaintiff and particularly so as to so-called Class One.

Evidently the classification was based upon the idea of placing those who paid adequate rates and upon a proper foundation to build for the future in Class Two, and then to scramble all others into Class One.

Yet according to the tables appearing in the statement of facts there can be no less than five or six classes based upon any idea of mutuality and uniformity in kinds or forms of insurance as to designated benefits and obligations and rates to be paid. There is no true mutuality between members who severally contribute at grossly inadequate or slightly inadequate rates and those who contribute at adequate rates. The plaintiff has invoked the doctrine of mutuality as being of the essence of this relationship on several features of this case and must apply it with substantial uniformity. There can only be real mutuality where contributions are made *pro rata* for benefits conferred. *Kennan v. Rundle,* 81 Wis. 212, 221, 51 N. W. 426; *State v. National Acc. Soc.* 103 Wis. 208, 215, 79 N. W. 220; *Dishong v. Iowa L. & E. Asso.* 92 Iowa, 163, 170, 60 N. W. 505. The member's equity in its funds never can rise to a greater sum than that which measures his equitable *pro rata* share of the contributions from which such funds grow. *Huber v. Martin,* 127 Wis. 412, 430, 438, 105 N.

W. 1031, 1135; *Zinn v. Germantown F. M. Ins. Co.* 132 Wis. 86, 89, 90, 111 N. W. 1107; *Ellinger v. Equitable L. A. Soc.* 132 Wis. 259, 267, 111 N. W. 567. See, also, *Southern Mut. A. Asso. v. Boyd,* 145 Ala. 167, 174, 41 South. 164; *U. S. L. Ins. Co. v. Spinks* (Ky.) 96 S. W. 889.

Plaintiff's classification clearly fails to recognize these essentials. If Class One should be maintained and members therein subject to assessments, then those under N. F. C. rates, who for years have been paying at rates which permit the building up of reserves sufficient to meet the calls of their certificates as they mature, can be called upon to pay special assessments to meet the needs of those who paid improvident rates. The deficit or loss for which such a call or special assessment would be necessary would largely be made up by reason of the early default of the older members and to that extent would be present as an undisclosed liability at the time the subsequent members, paying adequate rates, joined, and for such deficit the subsequent members ought not equitably to be held. *Davis v. Parcher & J. & A. Stewart Co.* 82 Wis. 488, 498, 52 N. W. 771; *Clark v. Iowa S. T. M. Asso.* 156 Iowa, 201, 205, 135 N. W. 1114, followed in *Malone v. Grand Lodge A. O. U. W.* 186 Iowa, 374, 376, 169 N. W. 438.

So far as a member of such a society can be permitted to call upon other members to make up for what the member himself has failed to pay, to that extent he is receiving that which is a gift or charity rather than insurance; to that extent he is a preferred member and the others are discriminated against. In a mutual association there can be no preferred members. But in Class One as so segregated by plaintiff are to be found such preferred members as well as those against whom discrimination is shown. Upon the grounds and for the reasons above stated the classification of members attempted by plaintiff in 1918 must be condemned and the subject left for future action.

We shall only say further on this subject that we see

no special advantage in any such attempted separation into classes over a simple system of bookkeeping and accounting of the funds of the society according to the different forms of policies issued or different rates required. The current insurance cost—that is, the payments each year to meet the disbursements of that year for death or other benefits or liabilities then to be paid—requires of course no special segregation of funds. It is only the portion of the premiums paid in by each member that is in excess of the current insurance cost of that year that need be segregated or kept as a separate fund upon which interest will accumulate and which will be held to meet future liabilities to the members contributing such excess funds. The segregation of such excess over the current insurance cost can in that manner apparently be as well preserved as a separate fund and its identity remain and be subject to the appropriate accretions by the contributions by members having the same kind of insurance or rates and subject to the necessary and appropriate payments therefrom as though made a fund of an independent class.

### Third—Transfers between funds.

The trial court declared by the judgment that any law of the plaintiff by which, on transfer by a member from Class One to Class Two, any portion of the funds accumulated in Class One to the credit of such member could be carried with him into Class Two, was void as violating the contractual obligations of plaintiff with members of Class One.

From what has been said above it is clear that every member whose contributions are so in excess of current insurance cost as to become part of a surplus or reserve has at all times an individual proportionate interest in such funds. This he does not entirely lose even upon forfeiture of the insurance by him; its present value is his, subject to options as to forms and to a surrender charge. This is so by the express language of sub. 2 (d) (3), sec. 1959, Stats.,

regulating such fraternal societies and preserving for their members such present value. If such present value to him of such accumulation is not lost by surrender of the insurance, it surely ought not to be lost by merely transferring from one kind or feature of insurance to another and from a lower to a higher rate of assessment in the same society.

It is clearly intended that this right or equity should be preserved and follow him from one class, group, or kind to another, despite the provisions in sub. 2 (f), sec. 1958, *supra,* that the apportioned funds or reserves for each class shall be kept irrevocably separate from all other assets and funds, and that all claims on certificates held by members in any class shall be paid only from the funds of such class, and the further provision that no such classification shall be rescinded or discontinued. Manifestly, if once contributed to such fund such contribution is to be deemed irrevocably dedicated to such fund, then it would of course become lost to him and vested in his then present fellow-members upon such transfer. But these provisions should not be construed to militate against the right of the individual member to his equitable, irrevocable proportion of such class funds. This is made certain by the further clause in the same sub. 2 (f), *supra,* that "any member may be permitted to transfer from a lower to a higher rate class, and to have transferred with him to such other class such part of any accumulated funds held for such members as provided in the by-laws." It is also expressly preserved by sub. *22m* (2), sec. 1959.

It follows, therefore, that with the transfer of the member from one class, group, or kind of insurance, whichever it may be, to another, there goes with the transfer the then proper accounting value of his interest in the fund so held by plaintiff, and his fellow-members of the class, group, or kind of insurance from which he transfers have no right to object or interfere. So much of the judgment below as is to the contrary must be and is set aside.

*Fourth—Re-rating age.*

This subject matter was not directly presented to and therefore not passed upon by the trial court. It is not here upon any specific objections presented. It has been called to our attention in the very able and interesting brief filed on behalf of the National Fraternal Congress by their counsel, Mr. Landis, as *amicus curiæ,* but was not discussed by counsel for the parties. It is, however, part of the plaintiff's readjustment plan, and we deem it proper to briefly discuss it.

With the laudable and necessary purpose of readjusting the future payments to be required from the older or so-called old-rate members who had been carried so long at inadequate rates, many problems were presented and difficulties confronted. Too drastic an application of the necessary medicine would result in causing the older members to withdraw to their and the order's loss, and so, to some of them at least, the blow was tempered by requiring them to pay thereafter what would be substantially adequate rates for members of the ages at which such members respectively joined the order, but much less than what would be required to pay for the same promised benefits if such insurance was newly taken out by members at the then attained age of such old-rate members being then re-rated.

Manifestly such a method of re-rating offends against the fundamentals of mutuality and uniformity. The difference between what he ought to pay and what he is required to pay results in a present or future deficiency which must be met in part at least by the newer members who are then paying for all of their own and part of his financial obligations, which would be inequitable, or it must be the subject of some future readjustments with resulting prohibitive assessments.

This question of re-rating has been considered and this view approved of in cases like the following, where even

in some instances it resulted, as it may with members of plaintiff here, in requiring assessments so large as to be practically prohibitory and making the insurance contract of no present value: *Supreme Lodge K. of P. v. Mims,* 241 U. S. 574, 36 Sup. Ct. 702; *Funk v. Stevens,* 102 Neb. 681, 169 N. W. 6; *Thomas v. Knights of Maccabees,* 85 Wash. 665, 149 Pac. 7; *Case v. Tribe of Ben Hur,* 106 Neb. 220, 184 N. W. 75, all *supra.*

Approval must therefore be denied any scheme upon other than the required mutual and appropriate method as of attained rather than entry age of any re-rated member and as above indicated.

### *Fifth—Method of assessments.*

The trial court held that the society had the power to levy special assessments to meet the requirements of the obligations as to old-age disability benefits, but it does not clearly appear whether it was intended that such assessments should be upon the entire body of the membership or merely as to Class One. In view, however, of the very substantial change presented on this subject from that in the court below by reason of the disposition we make of the other questions, the precise effect of the court's conclusion need not be determined.

There can be no question but that the society has power by express provisions of law, both of the state legislature and of its own charter, to levy special assessments to meet deficiencies arising from an insufficient accumulation of funds. In view of the substantial change that will be required as a result of this decision in the matter of segregating or separating the members, it is now impossible to lay down any precise rule, except to say that, under what has been declared heretofore herein to be the real relationship between the society and its members and they to each other, the same requirements as to mutuality and uniformity must control on this subject as on all others. It would

seemingly be a violation of the principle of mutuality to require members paying adequate rates which are sufficient to meet the obligations to them, to pay some additional sum to make good the deficiency arising from the inadequate rates paid by other members. Or again, if a classification be made by the society along the lines we have indicated as permissible under sub. 2 (f), sec. 1958, Stats., then, manifestly, and as was held by the trial court, the members in one such properly segregated class, with independent funds subject alone to payments on obligations arising to members of such class only, ought not to be subject to assessments to make up a deficiency in funds of other separate and independent classes.

### Sixth—Valuation and apportionment.

The plaintiff complains because the court below made no findings on this point and asks, the evidence being undisputed, that the action of the state insurance department be now approved and confirmed.

This valuation and apportionment was done at plaintiff's request after it had exercised the option given by ch. 251, Laws 1913, to adopt as a part of its law the thereby created sub. 22m, sec. 1959, Stats. This legislation provided that, in lieu of the other statutory requirements as to valuation, such a society might resort to the accumulation basis and the tabular basis, the former applying to the certificates in the so-called Class One and the latter to Class Two as they were then made up and as described above. The tabular basis applied only to certificates where members pay recognized adequate rates for all purposes.

The result of the "accumulation basis" was reached by crediting each member with the net amount contributed for each year and with interest at approximately the rate earned, and by charging him with his share of the losses for each year, or "cost of insurance," and carrying the balance, if any, to his credit. If after the first valuation

United Order of Foresters v. Miller, 178 Wis. 299.

any member's share of losses for any year exceeds his credit including the contribution for that year, the contribution shall be increased to cover his share, and that any such excess share of losses may be paid out of a fund especially created or from special contributions for such purpose. This method, with such provision for special contributions or assessments, would undoubtedly avert for a longer time the disastrous result bound to occur from the inadequate rates, and would, if it could be applied on some proper basis of mutuality and uniformity in the classes or groups to which it could be applied, be considered as a proper exercise of legislative discretion in the meeting of an unfortunate situation.

In the valuation the entire funds were considered, making proper deductions for the expense fund and the present matured liabilities, and then the small amount found on the tabular basis for the so-called Class Two. To those who had been paying the substantially adequate rates of 1906, 1914, and 1918 there was then assigned their appropriate amounts, leaving about $45,000 considered fairly to belong to the old-rate members. Some of such old-rate members joined at somewhat advanced ages and under such rates that made about $30,000 a proper credit to them. The then balance of about $15,000 was divided among about 7,000 of old-rate members and each was credited with $2 as the value of his policy at such time. There are discrepancies in this accounting, but from the nature of the situation some such cannot be avoided.

Naturally a result such as this, whereby a large number of members of an organization pledged to the spirit of fraternalism and who for a great many years have been paying the sums required of them by such society now find, after all these years and when they have arrived at a stage in life when insurance in other organizations is practically impossible, that all that is left of the years of their contributions is a valuation of $2 per $1,000 face value of

their certificates is very disheartening, and it is easy to appreciate the effect of such result upon such members. For many of such members to' now be re-rated at their present-age rates will require present contributions equal to promised benefits, and it therefore means, for all practical purposes, the effectual cancellation of the insurance that has been carried for so many years. It makes the solemn pledge of this fraternal organization, relied upon all these years by such confiding members, in effect but an empty shell.

While it may be true that the management in the preceding years did not rise to a full appreciation of the duty that probably rested upon them to take more drastic steps to place the institution upon a safe and sound foundation by direct action or at least by sounding the alarm more vigorously, instead of indulging in the delusions quite extensively advertised, as the record discloses, that it was in an enviable situation instead of its actual deplorable one, nevertheless present regrets or condemnation cannot alter the situation created by the inexorable laws regulating man's mortality and the accumulation of funds today to meet the needs of tomorrow and which laws have no regard for statutes or by-laws. The present situation could be met, it is true, by now assessing the membership, or substantially all of it, large additional sums to meet the improvident contracts of the past for the benefit of members who at least have had protection, so far as their beneficiaries were concerned, against the death of the member until the present time, and as suggested in the case of *Supreme Lodge K. of P. v. Mims,* 241 U. S. 574, 36 Sup. Ct. 702, the present existence of the member quite largely counterbalances, to him at least, the loss of the face value of the promise to pay his beneficiaries. Another alternative is to recognize, as we must and hereby do, that to assess the members paying adequate rates to make good the deficiencies on account of inadequate rates is a substantial violation of

United Order of Foresters v. Miller, 178 Wis. 299.

the foundation principle of mutuality and would undoubtedly result, as the history of other organizations so clearly demonstrates, in the destruction of this organization by the withdrawal of many present members and the falling off in applications for new membership. Therefore the mistakes of the past must be relegated to the past in order that there may be a safe and sound future for this organization.

It follows therefrom that, so far as the valuation of the individual policies is concerned, we can find no substantial objection to that as done by the insurance department and the same must therefore in substance be ratified and approved except as it may be subject to readjustment under future necessary changes. The same situation is presented as to the apportionment. That in its main features seems to have been substantially just and equitable and, subject like the valuation to appropriate future readjustment, must also be considered ratified.

The result, therefore, is as follows:

The judgment is reversed so far as it found and declared certain specified amounts due certain designated defendants; so far as it set aside the action by the society in 1900, abrogating the past and prospective insurance promising an old-age disability benefit; it must be set aside so far as it held that the separation of the members into two classes as attempted in 1918 was proper and lawful; and set aside as to so much thereof as in effect held that upon the change by one member from one class, group, or kind of insurance to another there could not go with him into such new situation his equitable proportion of the funds then held by or treated as belonging to such class, group, or kind of insurance from which he transferred.

It is further held that the practice of re-rating all members at the age of entry in the order instead of the age at such re-rating cannot be approved as a proper, just, and equitable method so far as the other members are con-

cerned; that the valuation and apportionment by the insurance department as of December, 1918, and December, 1919, is, in the main and as indicated above, approved and confirmed; that the subject of future assessments of members is to be governed by what is herein indicated; that the cause be remanded for a readjustment and re-arrangement of the affairs of the company in accordance with what is here declared, all such to be submitted for approval to the court below.

No costs will be taxed by either party as against the other; the appellant society to pay the costs of the clerk of this court.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings in accordance with this opinion.